The United States Court of Appeals for the First Circuit is now in session. All persons having any business before this honorable court may give their attendance and they shall be heard. God save the United States of America and this honorable court. Court is in session. Today's cases will be called as announced and time will be allotted to counsel. The first case today is U.S. v. Simon, appeal number 201368. U.S. v. Lee, appeal number 201369. U.S. v. Rowan, appeal number 201370. United States v. Kapoor, appeal number 201382. U.S. v. Kapoor, appeal number 20-1409. United States v. Gurry, appeal number 201410. U.S. v. Lee, appeal number 201411. Appeal number Simon, 201412. U.S. v. Rowan, appeal number 201413. And U.S. v. Gurry, appeal number 201457. Attorney Weinberg, at this time, please introduce yourself for the record. And then pause for the court to ask you a question. Good morning, your honors. Martin Weinberg on behalf of John Kapoor. Good morning, Mr. Weinberg. Just before we begin, to the extent that you know, could you clarify for us if someone, one of the defense counsel will be taking the lead with respect to the government's cross appeal and specifically with respect to the issue of sufficiency of the specific intent evidence and therefore whether if that evidence fails, if we agree with the defense position, whether that vitiates the mail fraud predicate for the RICO conviction. Do you know whether someone is taking the lead on that? I do, your honor. My co-counsel for Mr. Kapoor, Mr. Sayalkovich, is going to follow me arguing and will take the lead on the issues identified by your honor. I will instead be arguing the admissibility of the patient harm testimony. Yes, okay. Thank you. When you are ready, you may proceed. Thank you very much, sir. Nine patient witnesses gave highly inflammatory testimony of their horrific experiences resulting from their use, addiction to, and withdrawal from the prescribed opioid substance. They testified to hallucinations. They told the jury about the horror of their abuse, their addictions, their cravings, the nightmare of their withdrawals. The first of the witnesses talked about a breakdown, having to leave her kids on Christmas. I've spent most of her time in bed. A second witness said they couldn't find their way home and talked to a customer. His teeth were falling out. Others talked about seeing things. Yet the massive record of this case reflects no evidence that any defendant knew of the medical history of any of the nine patients, knew of their treatment, knew of their response to treatment, reflects no evidence that any doctor that gave the prescriptions to the nine patients communicated a single word about a single one of the nine patients to any defendant. This highly prejudicial testimony, the patient harm testimony, simply did not further the jury's resolutions. After 40 days of testimony of the crystallized material disputed issues. What was this? Mr. Weinberg, excuse me. Let me tell you what I'm struggling with on this issue. As I understand the government's case, the fact of addiction is part and parcel of the alleged scheme here. That the scheme itself was designed to get patients hooked, to use the vernacular, addicted and therefore to require higher and higher amounts of sepsis to be prescribed. Now, if addiction is properly viewed as an element of the defendant's scheme, if there is proof of that, then isn't it necessary or at least permissible for the government to put in some patient testimony to show that addiction was in fact happening, that this wasn't simply theoretical? The key, I believe, Your Honor, is the scope of the defendant's agreement and what was proven by evidence independent of these nine patients who testified. If the government failed to prove that it was within the scope of the defendant's agreement that the doctors mistreat the patients or prescribe amounts of medication that was in excess of the legitimate dosage. If there was no such proof, no such predicate, the evidence should not have been admitted against the defendant under 401. If there was sufficient proof, and I think Your Honor will decide on the cross-appeal what the scope of the defendant's agreement was, but if there was sufficient evidence, if that's the court's determination, it's still subject to Rule 403. There was no dispute. Patients get addicted whether they're prescribed medication by doctors receiving speaker's fees or doctors that have no relationship to the speaker fee program. It's inherent in the opioid. There was also no dispute that some doctors provided medically illegitimate treatment. The issue under 403 would be to weigh the marginal relevance of this addiction evidence, this withdrawal evidence, against the palpable permeating prejudice. The government centered the final argument, and they couldn't have done it without the patient testimony, on an argument that the CEO and the other executives of the drug company used the patients, exploited the patients, prioritized profits over patients, highly prejudicial summation that could only have been admitted through the evidence of the patient harm testimony. Also, the jury was just the palpable risk of a jury identifying with the patients and not with the out-of-state business executives. The jury getting distracted from these difficult issues of specific intent and the scope of agreement, and instead wanting to blame somebody for the human suffering that was represented by the nine patients who testified, testified to matters unknown to the defendants, testified to matters not disputed by the defendants. So when the court is weighing 403, regardless of how you view the cross-appeal, there's a strong argument that this evidence, admitted after 40 days of trial, without great necessity, with a huge risk, that it would distract the jury. The court knew, the government knew from Bourdier, we all know about what opioid addiction and opioid catastrophe has done to this community. Certain jurors had personal issues that they said they could overcome. One had a foster child who died. Were we to accept that, your argument, Mr. Weinberg, it would require us to find for you, as I understand it, through two screens of discretion. Because, as you know, Rule 403 judgments are inherently discretionary with the district court. And on top of that, our jurisprudence is very clear that only rarely and in the most extraordinary circumstances will we interfere with the district court's exercise of discretion in the Rule 403 area. So it's a fairly high hurdle that you face. It is, Your Honor, but this court has faced it before in the United States with Kilmartin, which we've cited in our briefs. Your Honor's found not only an abuse of discretion, but one that was harmful error, that affected the jury deliberations. Of course, Kilmartin is a case that I wrote, and I submit that a lawyer as good as you would have no trouble distinguishing Kilmartin on the facts. The principle is true. Of course, we can find an abuse of discretion if the circumstances warrant it. And again, Your Honor, we would urge the abuse of discretion standard either because the evidence was outside the scope of the defendant's agreement, making the co-conspirator conduct irrelevant and unknown to the defendants, or alternatively, under 403, because evidence of addiction and patient mistreatment was not disputed. The disputed issues, which this evidence didn't further the resolution of, is what was this defendant's specific intent, what was their knowledge, and what was the scope of their agreement. Other issues that you need to highlight? Thank you very much, Your Honor. My co-counsel will be addressing the other issues. Any further questions at this time from the court? All right, thank you. Thank you so much. Mr. Stoyorkovich. Good morning, Your Honors. Kostas Stoyorkovich on behalf of John Kapor, and I will be addressing both the prejudicial spillover and the Rule 29 cross-appeal. May I reserve two minutes for rebuttal? Yes. Thank you. Your Honors, the government chose to allege that these defendants, pharmaceutical executives, specifically intended for doctors to prescribe a powerful opioid for medically illegitimate reasons. And so the government assumed the risk of tainting its convictions if it failed to prove that intent. The illegitimacy was a centerpiece of that case, not only through the testimony of patient harm that my colleague referenced, but they said in closing that this is what these defendants did to those patients. And they said in rebuttal it was like the defendants shot a loaded gun into a crowd. It's a textbook case of spillover, and I submit that's why the government is fighting so hard to reinstate the acquitted predicates. Not to resentence anyone, but because the government understands without them, the remainder of the verdict is infirm. But unfortunately for the government, the cross-appeal fails and I would say for two independent reasons. First, the government is simply misdescribing what Judge Burroughs held. This is not anywhere close to the Olbrich's case. If you look, starting at government addendum page 19 at the district court's opinion, Judge Burroughs recounted all of the evidence that the government has argued here in several pages. It's not a lot of evidence. I don't mean to be rude. You've only got a limited amount of time, and our review on the sufficiency question on the government's cross-appeal is de novo. So it really is less important what Judge Burroughs said or did not say on that issue and more important as to whether the evidence viewed in the required light was sufficient to permit the jury to find for the government on the CSA and honest services predicates. I'd appreciate it if you could address yourself to that. Absolutely, Your Honor. The government wants you to focus to lose the forest for the trees. 3,000 doctors prescribed sepsis, 150 in the speaker's program,  What's the government's evidence? They're not even relying on the patient testimony as evidence in support of the acquitted predicates. They're relying on scant circumstantial evidence. Now, you can, of course, find intent from circumstantial evidence. I would never argue otherwise. But what is the evidence? It is less than five exhibits out of a trial of 1,200. It is a few lines of testimony out of 50 days of trial transcript. Let's look at all the evidence. Not one cooperator testified to this intent. All the cooperators said there was bribery, there was insurance fraud, but on this issue, no. And even the doctors, Your Honors, two of these doctors testified that they themselves prescribed for medically illegitimate reasons. They had no reason on earth not to also say, I told the defendant about it, this was part of my agreement. Anything inculpatory, they couldn't provide that evidence because it wasn't there. So what does the government have? They have one email that says in one page about one doctor of the 3,000, the words pill mill. To me, the government's brief, you'd think this was all over the case. It's one email that was sent to Mike Babbage, who testified he had no intent to cause illegitimate prescriptions, and the government said he was a great cooperator, testified honestly, and gave him a 5K. There's no evidence that my client even read that email. The evidence was it came to him in a stack of documents, and Babbage said he couldn't. He had no idea whether he read it. He got a stack of emails every day because he doesn't use a computer. What else does the government have? The dose program, Your Honor. Let me speak to that because I think it sounds incendiary until you actually see what it is. Look at the FDA label. The FDA label is an evidence in this case, and the research showed that less than 4% of patients got pain relief at the lowest dose. More than 50% required over the higher doses. Your Honor, the undisputed evidence on this issue is that Kapoor was told, JA3262, that sepsis patients at low doses were not renewing their prescriptions, and at JA12413 that sepsis was being prescribed at lower rates than the clinical trials. What was the initiative? To advocate for effective dose, but there's no evidence that in advocating for effective dose or tightening up that the sales reps were telling doctors what dose to prescribe at. The largest prescriber in the country, Auerbach, prescribed at 100 and 200, and he stayed in the company's good graces. Your Honors, I want to emphasize this is not like the cloth case. The doctors in these cases have largely been charged with anti-kickback statutes. That's a general intent crime, no focus on medical illegitimacy. By contrast, we have these defendants who are step removed, who don't know how these patients are being treated. We have a 50-day trial, and what can the government come up with here? I would point Your Honors to Guzman-Ortiz, an equipoise case, that says you have to look at the strength of the inferences, and you have to ask yourself, at some point, are we piling inference upon inference? This is why Judge Burroughs said the evidence is pretty darn thin before. Still let the government close on it, and what did they do? They bet the whole case on it. So Your Honors, you have to look at the whole case. Judge Burroughs sat through the whole case. The government's asking you to look at less than, I would say, .001% of the record, and the inferences from there are not strong enough to show proof beyond a reasonable doubt. And the judge has a role in proof beyond a reasonable doubt. I would just make one more point on this, and I do want to go back to the Obrey's case, just because the government relies on it so heavily, and I know Judge Telia, you were on the panel. I would like to distinguish it in three ways, and I think each of them independently. One, as I said, there was no balkanization here. That's what the government's argument is. If Judge Burroughs said, I'm going to look at this exhibit and nothing else and see if it proves intent, I'm going to look at this line of testimony and nothing else, that's balkanization, that's inappropriate. She did not do that. Clear as day, if you read her opinion. Second, in a critical difference, in Obrey's, there was plenty of evidence of knowledge. It's typically in a criminal trial, you have the good evidence of knowledge and then we're talking about intent. There was a tax case, the taxpayer knew what it said in the tax returns, they knew what they actually made. Here, what's the evidence that these defendants knew what was happening to these patients? And your honors, the warning saying that some percent of patients will experience addiction and side effects. But I have one more reason why Obrey's, you actually cannot reinstate, I would submit under Obrey's, the two acquitted predicates for this reason. Obrey's points out, your honors, and it's at footnote nine, page 975, in Obrey's, defendants only move for acquittal, not also for a new trial. Here, we move for acquittal, but in the alternative for a new trial, Kapoor did it at 10907 and also in the joint motion at 10878, and that's under a different standard. And so at most, even if you're not, even if nothing else I've said has resonated with you, I think the most you could actually do is send it back for a retrial on those predicates, and if you're going to do that, I respectfully ask you to send it back for a retrial. Mr. Akovic, I've got a question about that. On the alternative prayer for a new trial, Judge Burroughs never ruled on that, did she? She didn't rule on it as to the two predicates. As to the two predicates because it was moot on her version of the sufficiency of the evidence. So if we were to find that contrary to Judge Burroughs' ruling, and I'm not suggesting we will find this, but if we were to find the evidence sufficient on those two predicates, wouldn't we therefore have to let Judge Burroughs in the first instance deal with the alternative prayer for a new trial? I correct my statement, Your Honor. I think you're right. My point is I don't think the government's asking you to reinstate the predicates, and I think under Albright's, even if you don't accept anything else I say, I don't think you could just reinstate them. You don't think the government is asking us to reinstate the predicates? I thought that was the purpose of their cross-appeal. Oh, no. I'm sorry, Your Honor. The government wants you to reinstate them. Yeah, right. But I think not to reinstate them and remand them to the district court. My point is at a minimum a remand would be necessary. Right. But, Your Honors, I think that it's important in this case to look at, as the courts say, all of the evidence. Right? This was not a short trial. This was a marathon. Counsel, let me ask you this question. If we were to agree with you with respect to sufficiency on specific intent based on the argument that you've made with respect to the CSA and the honest services predicates, what does that do if what we have left is a mailing in furtherance of bribery, what does that do to the mailing element of the mail fraud count? Yes, Your Honor. So let me turn to that. Right. So what's left? You have the mail fraud predicate and you have the water fraud. So as to the mail fraud predicate, that's the one that the government linked to the bribery because the occasional bribes were via the mails. The issue with that is that that predicate lacks any evidence. I'm not talking about sufficiency. Any evidence of deception. There has to be some deception in a mail fraud scheme. And the government argued that the insurance or the government alleged in the indictment paragraph 31 that if the insurers knew that improper inducements were being paid, they wouldn't have covered the prescriptions. I'm not asking about deception. I'm asking about the mailing requirement. If the mailing only was connected to bribery and was not connected to inducing medically illegitimate prescriptions, how does that mailing then tie to the insurance fraud? Your Honor, I don't believe that it does. Tell me why not. Because of how the government charged the case. I will concede that the government could have charged the case that said that the bribery and the insurance fraud were part of one scheme. There's no legal reason why they can't do that. But that's not what they did in paragraph 31. And that's not how they argued the case. And the evidence in support of that, I think, also lines up with how they argued it, which is that the insurance issues in this case were not limited to prescriptions written by those 13 doctors. They were prescriptions written by all 3,000 doctors. And the IRC came into existence at a different time than the Speaker's Program. And so they were largely done by different people. And so what the government alleged in paragraph 31 was that the mail fraud predicate was linked to the bribery. And it alleged in other paragraphs that the wire fraud was about the lies on the phone in the insurance fraud. And Your Honor, I think that the point you're getting at is actually a point that Judge Burroughs made in her Rule 29 when she said, well, this could be viewed as just two parts of one scheme and thus they all stick together. And that is why she did not grant a new trial on the mail fraud. But we submit that's not how the government charged it. It's not even how the government argued it in Rule 29. So her redefinition of the scheme to save the mail fraud after trial was, in our view, akin to a constructive amendment. All right. Other questions from the Court? Yes. Yes, I have one question, Counsel, Mr. Sciocco. Going back to your equipoise rule argument, how do you harmonize the equipoise rule with Rule 29? Is your argument that the equipoise rule trumps Rule 29, or how do we analyze both at the same time? No, it does not trump it, Your Honor, Judge Helpe. But the way I would harmonize it is how this Court has done it in not only Guzman-Ortiz, but in Burgos, in Miami, Masonette, and Flores, which is to say that there is a role for the district judge in ensuring that the evidence viewed in the light and in totality in the light most favorable to the verdict clears, is strong enough to support a finding of guilt. In other words, reasonable doubt is not an issue only for the jury. And when we go to Rule 29, I think what the government amounts to is as long as a jury could find something, even if you have to stack 30 inferences on top of each other and it's highly weak and an attackable chain, you still have to affirm. That's what the equipoise rule protects against. There is a role for the judge, not to second-guess the jury, absolutely not, not to substitute for the jury, but to look at. And in here, what Judge Burroughs said, the evidence was so scant, so weak, and the inferential leap so great that the government didn't even in the light most favorable to it, these snippets of evidence did not prove the intent, even to a preponderance, let alone beyond a reasonable doubt. The defendants are entitled to that protection, and it is an important role for the district court, and that's why the equipoise rule has been affirmed time and again by the circuit, including just last year in Guzman-Ortiz. Judge Helpe, follow-up? I will move, thank you. Judge Salia, anything else? I'm content. All right. Thank you, Mr. Stoyokovich. You've reserved some time. We will hear from Ms. Siddall. Good morning, Your Honor. Megan Siddall on behalf of Appellant Michael Gurry. May I please the court, may I reserve one minute of time for rebuttal? Yes. Thank you. And I'll begin by addressing, Judge Howard, your question to Attorney Weinberg as to whether a government win on the cross-appeal would vitiate the defense arguments on the mail-and-wire fraud counts or predicates. The answer with respect to at least Mr. Gurry is no, because Mr. Gurry was only convicted on the mail-and-wire fraud predicates, and those issues would remain regardless of the results of the government's cross-appeal. After a trial that turned on a single cooperating witness, the government secured Mike Gurry's conviction. Just to be clear, my question was actually, that was helpful, but my question was actually the opposite, and that was who was going to argue that the district judge's ruling on the CSA and on a services count vitiated the mail fraud count? Oh, I apologize, Your Honor. No, that's all right. You were helpful, and you have not lost any time yet. Thank you. After a trial that turned on a single cooperating witness, the government secured Mike Gurry's conviction by telling the jury that he bore the responsibility as a corporate officer and with a dramatic demonstration in which the government compared Mr. Gurry and his co-defendants to indiscriminate killers shooting a loaded gun into a crowd. Both of these arguments and the government's repeated references to defendants just sitting there could well have tipped the scale against Mr. Gurry and his co-defendants. The district court agreed that both of these arguments were improper, but nevertheless declined to grant a new trial, and that conclusion was an abuse of discretion for several reasons. For example, the district court described the gun demonstration as isolated, but the gun demonstration was no passing moment. The point of the gun demonstration was that the defendants knew or should have known that somebody was going to get hurt and that the defendants simply didn't care, and that was a theme that resonated throughout this trial, beginning with the government's opening argument in which the government accused defendants of greed and putting profits over people. But that's not counsel in fairness. That's not the way in which Judge Burroughs meant that it was isolated. She meant there was only one remark that resembled or was anything like the gun reference. She said it was improper. She gave what seems on its face to be an appropriate curative instruction. I'm struggling with the notion of why in a 51-day trial, why that tips the balance. Well, it's true, Judge Selya, that the comment that the gun demonstration only occurred once in a lengthy trial, but I think the isolation inquiry is about whether the comment was likely to impact the jury and sway the jury's verdict. That's always the question when there's an improper comment, sure. Even if it's an isolated comment, if it has a tendency to inflame an impact despite the curative instruction, a defendant probably is going to get a new trial. Yes, and we would submit that here it did have that tendency. Why? What is there about a statement like that? We assume that jurors listen to and follow a trial judge's instruction, and we had a very explicit, timely instruction in this case, and I'm struggling with the notion that with the abundance of issues that have been presented on these consolidated appeals, that this somehow rises to the top. Well, the curative instruction was not as direct and as explicit as we would have requested. Oh, so you objected to the curative instruction? Yes, we did on the gun demonstration. I think the government acknowledges that we did object to the curative instruction, and we asked for stronger instruction that the gun demonstration was an improper comment on the law. Okay. Another reason to think that the district court abused its discretion here was in its failure to weigh the evidence against Mr. Gurry in conducting its harmless error analysis. On Rule 33, the district court looks at both the government's view of the evidence and Mr. Gurry's contrary view, and a review of the district court's post-trial decision will not reveal any portion where the district court analyzed the weight of the evidence against Mr. Gurry, and, in fact, the evidence against Mr. Gurry was quite thin. It turned on a single cooperating witness, Liz Gurrieri, who testified that Mr. Gurry told her to lie, but there were no documents corroborating her story, and there were no other witnesses who saw Mr. Gurry tell anyone to lie. But in its rebuttal closing, the government tried to bridge that gap by giving the jury an alternative basis for finding Mr. Gurry responsible for what went on in the IRC. Even if the jury wasn't convinced that Mr. Gurry told Ms. Gurrieri to lie, the government essentially said, that's okay, you can convince Mr. Gurry because he was the guy in charge, because he was Ms. Gurrieri's boss. For the foregoing reasons, we would submit that the evidence against Mr. Gurry was too thin to support his conviction, and that the government's improper rebuttal would have swayed the jury, and we therefore ask your honors for a new trial. Thank you, Ms. Sittle. Before you step back, there are some complications with these remote hearings, although I think this one's going relatively smoothly. But just before you step back, are there any additional questions from the court? Not from me, Judge Howard. All right, thank you. If you would mute your devices, we will hear from Mr. Kendall. Good morning, your honors. My name is Mike Kendall. I represent Joseph Rowan. I'd like to reserve one minute for rebuttal. Yes. I'm going to address standard of review and sufficiency. Three documents show Rowan's mail fraud appeal is subject to de novo review, though the government can test that. Rowan's motion for acquittal, ECF 861, and joint appendix 10898 states, Rowan joins in full and incorporates by reference ECF 816, our initial Rule 29 motion. ECF 816 states at joint appendix 9488, a general challenge to sufficiency. Quote, although defendants respectfully submit that the government's proof has failed on each and every element of the charged RICO conspiracy, defendants focus its written submission on those aspects of the government's case that are most clearly deficient. Then at joint appendix 9503, there are two pages that specifically challenge the sufficiency of the mail fraud. Consequently, Judge Burrow's order on the post-trial motion states at government addendum 25, defendants collectively challenge the legal basis of the wire fraud predicate and the sufficiency of the evidence of the mail fraud predicate, and they individually challenge the sufficiency of the evidence on both the mail and wire fraud predicates. She further found at government addendum 31, all defendants move for acquittal on the mail fraud predicate at the close of the government's  We made both an unambiguous, specific, and general challenge to the sufficiency of the mail fraud evidence. Tonko-Baez, of which Judge Howard was on the panel, and Marston hold that a general challenge preserves for de novo review the full range of challenges, whether stated or unstated. We are wearing both the felt and suspenders on this issue. I'd now like to move to sufficiency. The district court affirmed the verdict because the IRC employees made calls to the insurance companies and lied about patients. Mr. Kendall, I'm sorry. Maybe you can help me with this. I think I also, I think I wrote fully in which we suggested that even with a general objection with respect to sufficiency, if you then go on to identify specific issues and spend most of the post-trial argument on that, that may result in a different standard of review. Am I wrong about that? Your Honor, I recall more Judge Lentz's opinion where she discussed it could be ambiguity. And if you use specific ones, it created an ambiguous record. We don't have that here. We specifically have a general objection and then saying we're only going to address certain specific ones. There's no ambiguity in the limitation. And further, certain borrows. Excuse me. Do I understand from that that you're not prepared to address or not going to address Foley? Because like Judge Howard, I think Foley has some pertinence here. I'll address that in my rebuttal, Your Honor. Okay. If that's okay with the court. But I do feel we specifically said it was a general objection and our specific ones were only part of the issues. We distinguished that we were not addressing everything in the specific objections. And if you look at Judge Burrow's findings in her order on the two pages I just cited, she agreed with that. She found that everything was preserved in her lower court hearing. So I think there was no ambiguity or confusion if that's what the issue is. I'd now like to move to sufficiency. The district court affirmed the verdict because the IRC employees made calls to the insurance companies and lied about patients. In order to convict Rowan, the government must prove he knew that people 1,800 miles away in Arizona were lying to the insurance companies and that he intentionally joined the fraudulent agreement. The government does not dispute that it's perfectly legal for healthcare companies to operate an IRC for insurance authorizations. Join appendix 4297 and 4714. Rowan in Florida and his sales team helped doctors complete authorization forms and they faxed them to the IRC. The government does not claim there was anything fraudulent about the forms. No one claims Rowan visited the Arizona call center. None of Rowan's normal business contacts of prior authorizations support any inference of fraud. The district court relied on the transcript of the April 2013 meeting and joined appendix 12257. Liz Guerrero ran the IRC and is on the tape. She testified she had just started lying to the insurance companies just a few months or a few weeks prior to this meeting. Join appendix 4728. Rowan says nothing on the tape to indicate he's aware Guerrero has just started running a fraud in Arizona. Guerrero says nothing that could inform an innocent audience that she had started this fraud. The government introduced a tape through sales rep Lillian Ligotti. Please review her testimony joined appendix 8286. She is the only person who testified about that meeting. When asked about the two statements that supposedly show a fraudulent intent, she disagreed with that interpretation completely. She didn't know why Guerrero was asking about history of cancer. She had no understanding the meaning of we have our own list to indicate fraud. If we are to draw an inference of anything about this tape, I think we should look to what the only witness who testified said. Finally, they raised the issue of Rowan said how you get paid. The government claims he's telling a sales team that they'll make money from the fraud. If you look at the transcript, the how you get paid occurs seven pages after the discussion of history of cancer in the list. And he's telling people, take the time to fill out the form legibly. Take the time to do it without whiteout and scribbles and corrections. This is how you get paid. It has nothing to do with fraud. The government has in this case taken a large volume of evidence that deals with normal IRC functions that Rowan may have associated with, cite that, and claim we should infer some sort of negative intent or fraudulent intent from business transactions that are permitted. If you take a look at the emails they cite that he received, none of them have a fraud allegation. The reference to Dr. Chun's liaison, the testimony is he had no involvement in fraud at all. And so what I suggest to you, the uncontradicted evidence is that he had no involvement in fraudulent behavior. We have to infer inferences based upon the aggregate of the evidence. But a rational jury could not infer from the tape proof of Rowan's fraudulent knowledge and intent beyond a reasonable doubt. And the rest of the evidence is completely agnostic to Rowan having any fraudulent knowledge or intent about the IRC. Thank you. Thank you, Mr. Kendall. Additional questions from the court? All right. If you would mute your devices, we'll hear from Mr. Horstman. Good morning, again. My name is Pete Horstman. I represent Sunrise Lee in this matter. I'd like to thank my colleagues, Mr. Weinberg, Mr. Stoyalkovich, and Ms. Sittle for making joint arguments that are related to Sunrise Lee's appeal in this case as well. I'd like to talk about two issues that are distinct and overlap some of the arguments already made with respect to Sunrise Lee. In this case, the government essentially chose as part of its prosecution a well-orchestrated character assassination of Ms. Lee in order to prove the Controlled Substance Act portion of its case. It did that by introducing evidence of her prior employment at a gentleman's club and by introducing evidence that she behaved in a manner consistent with a lap dance for one of the doctors that was in her region, Dr. Madison. These go directly to the prejudice argument that was referenced by Mr. Stoyalkovich. The overflow from these is not something that a juror, even one who was instructed by the court, and this sort of goes to Judge Selye's question on the gun as well, there's certain things you can't unhear in a criminal case. You can tell a jury to disregard something, but you can't unhear. I can understand that, but take this one at a time. If the CSA and honor services fraud predicates stand, and I realize your position is that they shouldn't, but if those predicates stand, isn't the evidence that you're now contesting fairly clearly relevant to those counts? That's what the judge found, but we had moved prior to trial to exclude this evidence. I understand you moved to exclude, but why isn't it relevant? This seems to be just another way of improperly inducing a physician, in this case a particular physician, with respect to, for example, a lot of the inseparables, to do the conspiracy's bidding. Well, first of all, I would continue to maintain that it's far more prejudicial than probative. The district judge agreed with me. But on another... The district judge didn't agree with you. She wouldn't have let it in if she had. I'm sorry. She clearly disagreed because she repeatedly allowed it in. The issue beyond the prejudicial impact of it is the relevance. And we're talking about something here that is, and this was part of our case, was that Miss Lee was part of a misogynistic pharmaceutical system that preyed on femininity and sexuality in order to sell drugs. And this was why she was recruited by Alec Berlikoff. This is why she was recruited to perform sales functions. And we heard throughout the course of the trial, much like our argument on the insurance fraud part of this, that these were things that were done in the pharmaceutical industry. Counsel, hold on. First of all, the fact, whether or not they were things that were done in the insurance industry has very little to do with whether they were relevant evidence in this case. But the essence of this alleged scheme is that physicians were being improperly bribed to dispense substance where it wasn't medically necessary, and then you have the wire fraud aspect on top of it. But with respect to the bribery, physicians can be bribed in ways other than simply the payment of money. They can be bribed by being offered other inducements. I'm struggling with the concept of arguing that this was not relevant evidence. I can understand the argument saying, well, it was relevant, but the relevance was substantially outweighed by its prejudicial effect. I'm not saying I buy that, but I at least understand it. I don't even understand the argument that it wasn't relevant. Well, it may be relevant to one piece of the case, but that's why we filed a severance motion. There's certain evidence here that should not have come in for multiple counts, and it was weaponized by the government. The CSA was a Trojan horse for the government to get all this evidence in about Ms. Lee's background and some of her conduct on charges for which it would not have been independently admissible. And the district judge noted that in several of her rulings, including her pretrial ruling on the motion in limine, which is in her addendum. I'd like to move on to the Rule 29 portion of my argument, unless somebody has another question on spillover prejudice. I would simply say, and I'm aware of the time here, I would simply say I sent in a Rule 29J letter, which refers to an opinion recently written out of the Fifth Circuit in United States v. Norah, which I suggest is a roadmap for engaging in the kind of detailed record analysis that needs to be done in a case like this. The judge found four things against Ms. Lee that there is absolutely no evidence are criminal acts. The fact that she was involved in a pilot program with Liz Guerrero. If you actually drill down into the record, it's a very simple question and answer between the Assistant U.S. Attorney and Ms. Guerrero on the witness stand. Do you know who Sunrise Lee is? Yes. How do you know Sunrise Lee? I worked with her on the pilot program. That's it. What the pilot program accepted in terms of documents, as you heard Mr. Kendall argue, there was never a suggestion that the documents that came from the doctor's offices were fraudulent in and of themselves. And therefore, the judge's finding with respect to Ms. Lee on all four of those is not the kind of depth analysis that I believe the court should entertain or accept, and the court should follow NORA. And unless there's further questions, I would rest on my argument. Thank you. I see no questions, Mr. Horsman. Thank you. If you would proceed to unmute your devices. I believe Mr. Fick is next. Good morning, Your Honors. This is William Fick on behalf of Defendant Richard Simon. And I would like to reserve a minute for rebuttal, if I might. Yes. Thank you. Richard Simon is entitled to a new trial because he was deprived of his constitutional right to unconflicted counsel. While the law firm Weill Gottschall was defending Mr. Simon, it accepted a concurrent multimillion-dollar bankruptcy engagement to represent INCIS, which was cooperating with the government in prosecuting Mr. Simon. Weill's duty of loyalty to INCIS precluded trial counsel from pursuing a viable strategy to pierce INCIS's corporate attorney-client privilege to obtain materials from INCIS concerning the massive $30 million investigation by outside counsel. Mr. Fick, do you agree or disagree that Judge Burroughs applied the correct legal standard to your motions with respect to the alleged conflict? So, she purported, I think, to apply the correct legal standard. But if you actually look at her analysis, I should make it clear. But the legal standard that she stated, I didn't gather from your brief that you were disputing the legal standard that she stated. I understand you're disputing her application of it. I just want to get that clear in my mind. Correct. Unless I'm forgetting some stray reference she made, I think it's clear under both the Supreme Court and circuit precedent that Mr. Simon need only show trial counsel might plausibly have pursued an alternative defense strategy which was in conflict with trial counsel's other loyalties. She need not establish that the alternative defense necessarily would have been successful so long as it possessed sufficient substance to be viable. Now, I would submit when Judge Burroughs applied that standard, she essentially, notwithstanding that language, engaged in a Strickland-like analysis by looking at what the outcome would have been, whether it would have affected the outcome in her judgment. And that, I submit, is an erroneous application of the correct standard. This is clear in this circuit precedent, and goes all the way back to Justice Scalia's opinion in Mickens. It's very clear. The question is, did the conflict affect what trial counsel could do, not did the conflict affect the likely outcome of the trial? And so here I would submit the strategy to pierce Incis' privilege plainly had substance in the language of the precedents. Excuse me. The first issue it would seem to be is whether such a strategy was plausible. I mean, you have both plausibility and viability. Both of those, as I understand the standard, have to be shown. On plausibility, it seems to me that in the very best of circumstances, piercing that attorney-client privilege would have been a two-edged sword because once you pierce it, then it's open for the government to rummage through that scant investigation, which no one seems to know what really is in that investigation. That may go to viability. Your Honor, respectfully, I think even Your Honor's question in some ways is conflating the plausibility and viability or impact on the trial question. And look, the district court itself repeatedly during the trial raised this as an issue and noted that there could be important exculpatory information in the internal investigation materials. I think maybe the best example was on day 41 at page 8448 of the joint appendix. The court observed, for example, that on the one hand, the defendants want to say there was compliance. The government wants to say it was a sham. The government then types in, we're interested in the truth, and the court responds, well, you've got to talk to Mr. Hobart, INCIS's outside counsel, about that. We're all malconstrained. I apologize, that may have been my timer. We're all malconstrained, the court said, with the universe we live in. Now, there may well have been helpful and harmful material here, but at the end of the day, Mr. Simon is very differently situated from the other defendants. He joins later after the ISP and the IOC are running. He's not an officer. He's not in Arizona. He was laid off with severance, unlike the ringleaders like Babich and Berlikoff who were fired. And so the issue isn't really unbalanced. We have to make a judgment about whether he would have won the trial with the material, but there was certainly ample material there. A $30 million investigation buys a lot of work, even at scanty rates. Ample material there from which defense counsel could have crafted a defense and put together support for the good faith defense, which was really just air in the absence of that material. The point would be, it's not just that there was this investigation that we don't know anything about. It had substance. It had meat. And at the end of the day, the management having done that investigation, no one ever instructed Mr. Simon to change his behavior, suggest that he did anything wrong, and he could reasonably rely on that, which would establish good faith. But even all of that discussion gets us too far into strickland land, I would submit. The bottom line is the legal basis to obtain those materials, the substance of those materials, the potential value of those materials were really quite remarkable, as the district court itself recognized over and over again. I just want to make sure I understand the demarcation line in your argument. Are you saying that it would have uncovered, if it were pierced, it would have uncovered exculpatory material with respect to your client, or is your point that it reasonably might have? I think I would put it as unpractical plausibility. I would submit it was highly likely to uncover exculpatory material and certainly would provide substance to support a good faith defense. But if the district court's finding was that it would be damaging, what is our standard of review on that specific finding? I would submit that is actually not a factual finding, that is an ultimate issue finding on the legal standard as to which there is de novo review. If, however, the court wants to cast that as a factual finding, which I don't think would be correct, I would submit that that is clearly erroneous and runs contrary to what the district court itself said and postulated over and over again about these privileged materials. In other words, the district court itself raised on numerous occasions ways in which this material could be exculpatory and ways in which this would provide substance underneath this sham versus reliance on compliance argument that was being made in the air. And unique among all the defendants, Mr. Simon's counsel was now in a position to make an unconflicted decision for Mr. Simon about his unique circumstances about whether to pursue this course. And so what other counsel did, the fact that like outwardly what everyone did in this trial was sort of working like and well done, really doesn't capture the issue. It's what Judge Burroughs didn't know that is so deadly here. She wasn't aware of this issue until the Wall Street Journal published this article and we came in as counsel and put together the record that we did on the motion for a new trial. And so you can see in her comments a great reluctance to sort of undo the 50 days of work that had been done here and a general feeling that, well, counsel was very professional, but that, I submit, is not the issue. It's what she didn't know that undermined Mr. Simon's constitutional rights of requiring a trial. But, counsel, what do you do with the black box aspect of this? The fact that no one who is privy to this argument seems to know exactly what is in that Skadden investigation. And there is every reason to believe from what facts we do know about the company's operation that it is equally or more likely to include damning information than to include exculpatory information. So why does it become plausible that unconflicted counsel would want to open that up for the government, particularly in light of the fact that all the other counsel in the case, none of whom had conflicts, didn't see fit to do so? Two answers to that, Your Honor. One is that I think, again, respectfully, I think that pushes us toward the Strickland question, which is not the issue here. That's the question of whether this would have won the trial. The second answer, though, is even opposite. But is it plausible to expect that counsel, completely unconflicted, will do something that is more likely to damage his client than to help his client? Well, I don't think there's any reason to think it was more likely to damage Mr. Simon as opposed to anybody else because of his... But that's the question, more likely to damage Mr. Simon. Would it be more likely to be favorable to Mr. Simon or favorable to the government? That's the question. I mean, that's really an alternative sort of articulation of the same coin, right? Because Mr. Simon is differently situated from everybody else, I submit it's highly likely that the evidence from the internal investigation, even if it uncovered lots of wrongdoing at IMSSS, would have helped to show, could have been used to show that Mr. Simon was not part of that, was not aware of it. And so, and to say that it's implausible, I mean, it's something that's been done in cases, including in the District of Massachusetts and the Stryker Biotech case, right? The legal predicate to do it is there. It's an available avenue. It's something that defense counsel have done in defending a criminal case, and I submit it's something that unconflicted counsel would have had every reason to pursue in Mr. Simon's situation. Thank you. And I believe you've reserved some time, and so we will hear from the government now. Good morning, Your Honors. May it please the Court, Dave Gugelman for the United States. Unless the panel prefers otherwise, I will start with the cross-appeal issue, which tests the jury's verdict on the CSA and honest services predicates. Four defendants, four out of five, Kapoor, Lee, Simon, and Rowan, arranged bribe payments to 13 co-conspirator doctors, tethered to the amount of the drug substance that they provided. And these bribes sometimes exceeded $100,000 per year. The jury then heard testimony about the decision to try to recruit a reputed pill mill doctor into the scheme, the efforts to put substance on the shelves of pharmacies connected to particular co-conspirator doctors that had been red flagged for suspicious ordering, the push to have doctors agree to prescription quotas, a weekly number of prescriptions to write each week, and finally, the campaign to have doctors elevate the dose on individual patients already on substance. From this, the jury reasonably concluded that these defendants specifically intended the distribution of the drug outside the usual course of medical practice, and that verdict should stand on a sufficiency review. So the bottom line question on Rule 29 is, does the jury's verdict reflect a rational appraisal of the evidence on this question of intent, CSA intent? And I don't want to rely too much on the district court's order because it is a de novo review, as Judge Selye said, but on page 22 of the government addendum, the district court agreed with us on this question. It would not have been unreasonable for the jury to infer the nefarious understanding described by the government on the question of intent. In our view, the sufficiency inquiry should have ended there because the court has answered the essential core question of the Rule 29 inquiry, and the evidence supports that. I'll dive in just briefly to some of that. We have a very large… Is that meant to be a legal challenge of some sort to the circuit's application of the Equipoise Rule? It is to the district court's application of the Equipoise Rule. We are not asking this panel to jettison the Equipoise Rule, but simply to recognize that what happened on at least page 22 of the government addendum, the district court is balancing reasonable inferences against each other. The inference proffered by the government and the hypothesis of innocence offered by the defense. The district court says they're both reasonable, and the district court grants the Rule 29 judgment of acquittal. We think that that sequence is the same sequence that this court said was erroneous in Olbrich's. If a rational jury could agree with the government, the inquiry ends. And we think the district court actually answered that question in our favor. On this particular evidence in this case, we have a very large bribes for prescriptions scheme. The defendants are facilitating bribes to these 13 co-conspirator doctors to prescribe as much substance as possible, and that, we think, gets us close, if not over the sufficiency question on intent. But then our cross-appeal brief also charted additional five categories of evidence. Kapoor and Lee facilitating bribes to Dr. Madison despite knowing his reputation as a pill mill doctor. And opposing counsel has said that that's a stretch. There was no evidence that Kapoor knew that reputation. Joint appendix 42-18 and 42-19, Babbage testifies that he has a specific conversation about Dr. Madison's reputation as a pill mill in a possible law enforcement investigation. We also have the effort by Kapoor with help of several of the other defendants to get substance on the shelves of three conspirator doctors who had pharmacies affiliated with them. And those pharmacies had trouble getting the number of opioids they needed to keep up with this prescribing because of red flags by drug wholesalers. And then we get this agreement where the company will ship the drugs directly to the pharmacy in exchange for the doctor's agreement, at least this is for Dr. Ahmed, to write more scripts that we can handle. 33-44 of the joint appendix. The jury can adopt the common sense inference that tethering a prescription decision to a business deal with the doctor's pharmacy steps outside the usual course of medical practice. They're asking the doctor to prescribe based on a business relationship rather than patient best interest. We have the quotas from Mr. Simon emails the sales force, encourages the sales reps to negotiate weekly quotas with doctors. Even the defense expert agrees that this is problematic. 99-81 of the joint appendix. The defense expert testifies on cross that doctors cannot pre-commit to prescribing medication before seeing a patient, examining a patient. So the inference that the government is asking that this court to draw and we ask the jury to draw is supported by the defense expert. Finally, this is the dosing campaign. We disagree with opposing counsel's view that this is an informational campaign designed to show doctors that low doses may be ineffective. The proof showed that sales reps got a list of individual patients who received a low-dose prescription, and the sales reps were supposed to go to the doctor and advocate for them to increase the dose on specific patients. Again, the jury could adopt the common sense inference that having lay employees with no medical training approach doctors about dosing for individual patients is asking the doctor to step outside his or her role as a doctor. Even the defense expert appeared to support our view of this. 10-002 of the joint appendix. The defense expert on cross testifies that patient dosing is a medical judgment, and sales reps do not and cannot advise the doctor how to dose an individual patient. Rule 29, line up the bribes for prescription scheme and all the testimony that I just described and the proof that I just described, put it all into the governance column, as Rule 29 requires, and ask could a jury rationally agree that these defendants intended for their coping spirit or doctors to step outside their role as doctors and prescribe illegitimately outside the usual course of medical practice. Maybe the answer is yes. But it seems to me that there may be one thing missing from your argument or perhaps I misheard. It seems to me that what you're saying is that at best, at most, that the defendants or four of them would be reasonably certain that the doctors would be influenced by the bribes, and then I think it's a little bit of a leap, but maybe it's an adequate inference, to therefore prescribe medically illegitimate prescriptions. But what do you do with Gypsum's statement, the court statement in Gypsum, that even this certainty isn't enough? It has to be their specific intent to bring about that outcome, and there does seem to have been overwhelming evidence here that what they were after, the defendants were after, were as many prescriptions as could be written as possible, the suggestion being that they didn't care whether they were legitimate or illegitimate. So what do you do with Gypsum's statement? My response to that is whether the defendants were only interested in just generating a ton of prescriptions, or were interested in generating a ton of prescriptions by asking the doctor to step outside his or her role as doctor. That is a jury question, and the jury here rationally concluded that the defendants intended for these doctors to step outside that role and operate more as drug pushers as compared to doctors. And our brief cited a number of cases from other circuits when we had things like quotas, or involving lay folks in prescription decisions, that that all is evidence that supports the 841 charge, the inference that we asked the jury to draw here. Let me ask you one question which I asked the defense counsel. How do you harmonize Rule 29 with the Equipoise Rule? Because it seems to me from your analysis, you just talked about the Rule 29 argument. What's your position on that? The harmony of that I think is the roadmap that this court provided in the Olbrich case. The Rule 29 inquiry is the same. Identify the relevant evidence, draw all reasonable inferences in favor of the government, identify the defense's proper hypothesis of innocence, and then ask whether the jury could agree with the government and rationally find the disputed element satisfied. I think, Your Honor, the Equipoise formulation describes a scenario where the evidence walks up to the line, but the jury cannot rationally agree with the government. I've gone back 30 or 40 years. I can't find a single case in this circuit which relied on the Equipoise Rule to either grant a judgment of acquittal or affirm a judgment of acquittal. And in Olbrich, the court cautioned that the Equipoise formulation, the stripped-down formulation, is problematic because it entices reviewing courts to balance reasonable inferences against each other. And that's what I think the district court erroneously did below on page 22 of the government addendum. And that's just not in play in a Rule 29. So the Equipoise Rule is present in this court's case law, but it hasn't really had any practical consequence. And we don't think it does here, because the jury, looking at the broader scheme and the individual efforts that I just described by the defendants to promote these doctors' prescription of the drug, the jury can rationally agree that these defendants, with the co-conspirator doctors, intended for illegitimate distribution. So your argument is that Judge Barrow should have done the Rule 29 analysis and stopped there if she denied the motion based on the Rule 29 analysis. That's correct. Yes, that is correct. Unless there are any additional questions on the government's cross-appeals, on the CSA intent element, I'll move to some of the other claims. I think it may be helpful to roadmap, at least with the government's view, how the claims turn, because it will turn on how the courts resolve the cross-appeal. If the panel agrees with the government, it would still need to address the admissibility of the patient testimony vis-à-vis the CSA predicates. And then I agree with Ms. Sidall, Mr. Gurry would have a remaining residual claim, excuse me, a spillover claim. The second universe, if the panel... Excuse me, counsel. Did Mr. Gurry ever move for severance? I don't recall, Your Honor, but I'll double-check that after the argument. Thank you. If, in the second universe, where the court disagrees with the government on the cross-appeal, it would then turn to the fraud sufficiency challenges and the evidentiary challenges that the defendants have raised today. And if I could march through both of those universes in turn. The first universe, if the government agrees with the cross-appeal, if the panel agrees with the government on the cross-appeal, it would need to decide the admissibility of the patient testimony vis-à-vis the CSA predicate, and this goes to Mr. Weinberg's argument. And on this point, no abuse of discretion. In our view, the district court properly admitted patient testimony, both under 401 and 403. And I'll start with a general principle that is in this court's case law. A co-conspirator's words and actions are admissible to establish the existence and scope of the conspiracy. The doctors were named as co-conspirators in this case, so their words and actions are admissible in this trial to establish what was the object of this bribe-for-prescription scheme. And the patient testimony documented that, including the patient testimony documenting the fact of an addiction, the fact of a side effect. That's interwoven into the question of whether these co-conspirators, while taking the bribes, were prescribing illegitimately. And I could give the court just two quick examples, patient Carrera, patient Laura. These were patients who were placed on the top dose of substance by the doctor, and they complained to the doctor. Carrera, I started seeing things and hallucinating. Laura suffered severe memory loss, couldn't find his way home. Hallucinations, both awake and asleep, as well as teeth falling out. These patients complained to the doctor, and the doctor, Dr. Stomperl, told one patient, get used to it, 82-49, and then told the second patient, these side effects were not from the medication, 79-13 of the joint appendix. Dismissing patient objections about side effects supports the inference that these co-conspirators, while taking the bribes, had stepped outside their role as doctors. And this court said as much in the Clough case. The drug pusher, different charges there, but the drug pusher inference was the proof in that case. And in describing the government's evidence supporting that inference, the court, this is at page 820 and 821 of the decision, cited similar testimony about doctors ignoring patient objections to side effects. Second example, we have patients who the doctor saw the signs. This is patient Skalnik, and she grew addicted. She took substance more quickly than prescribed, and she suffered severe side effects as a result. 9001 of the joint appendix. The doctor, her doctor testified that he saw the signs, suspected that the patient was abusing the drug, and the doctor made the decision to keep on prescribing. 1628 of the joint appendix. In Clough, this court cited similar testimony as relevant to the drug pusher inference that the government asked the court to draw there. We're asking for the same inference here, showing that this is relevant. Final points going to Mr. Weinberg's Rule 403 arguments. Three top-line points. This is an abuse of discretion. This court gives wide leeway to the district judge, and the district judge here faithfully discharged her Rule 403 obligations. One, she issued an extensive pretrial order setting forth the rules of the road for this patient testimony. The patient could identify the fact of their addiction and their side effects, but the court carved out those inflammatory aspects about suffering or drugs or anything else. Second point, the 19 pages cited in the briefs where this testimony occurred, the testimony was exceedingly brief. It complied with the district court's rules of the road. And this is to my third point. The one or two times that the patient stepped outside of those rules and where the defense objected that this was beyond those rules, the district court sustained the objection, the example being 8249 with patient Carrera of the joint appendix. On this record, it is impossible to say that the district judge abused this discretion in allowing this in. I'd like to turn to the second universe where this court rejects the government's cross-appeal and then engages on the question of sufficiency and the evidentiary challenges of the predicates. First, Mr. Stokoyevich again represents that the government has failed to properly plead a fraud scheme premised on affirmative laws or a male fraud scheme premised on affirmative laws. But this argument depends on dicing up the indictment into different parts saying this is male fraud, this is wire fraud. That's not how a RICO indictment works. We list out all our factual allegations and this court asks whether those factual allegations properly allege activity prohibited by the male fraud scheme or the wire fraud scheme. In this case, we allege the mailing, paragraph 34 of the second superseding indictment, page 346 of the joint appendix. And then we went on to describe alleging that the defendants had subordinates make affirmative misrepresentations to insurers in furtherance of the charge scheme, paragraphs 67 through 70 of the superseding indictment. If the court needs any confirmation, look at the defense motion for bill of particulars. District Court document number 501, top of page 6. The defendants themselves, pretrial, are describing the fraud scheme alleged in the indictment. And I'm reading verbatim. The second superseding indictment alleges four types of materially false or misleading statements that defendants allegedly instructed their personnel to make to insurance companies. So pretrial, the defense understands that both of the fraud predicates are premised on an affirmative lies to insurers allegations. So there's no... So you know that I'm interested in the mailing piece of this. What am I missing when I think that the mailing goes only to the bribery? And if the honest services and CSA predicates are out, then how does the mailing... Where's the evidence of the mailing with respect to the insurance fraud? Yeah, my response to that, and I think this is how the district court saw it, this is a continuous feedback loop. It's like the ongoing venture of the Supreme Court discussed in the Schmuck case. The bribes motivate the co-conspirator doctors to write prescriptions. The defendants do the IRC, take those prescriptions, go to the insurance companies and get payments back through various misrepresentations. The revenue comes back, and the cycle continues. Bribes the doctors, generate the prescriptions, insurance fraud. In Schmuck, pages 711 through 712 of that opinion, the Supreme Court talked about the question, if the mailing is designed to keep harmonious relations with your co-conspirators, it's part of a scheme, it falls under the mail fraud statute. So is your point then that the specific intent required for the honest services predicate is not proved? That's beside the point. Is that what you're saying? Yes, Your Honor. The district court actually references that in its post-trial order, talking about this argument that there's no specific CSA intent element on the fraud side of the case. We simply need to show that the bribes were a step in the plot, and the proof here around sufficiency review supports the government's contention that this is one continuous feedback loop. The bribes generate the prescriptions, the prescriptions generate the insurance fraud, the revenue comes back to the company, and then the bribes go out again. But what if the prescriptions were medically necessary or medically legitimate? Where's the insurance fraud? So the question of medical legitimacy is not an element of insurance fraud. The insurance fraud is the prescriptions that were generated by the bribes, the defendants had their personnel then make misrepresentations to insurance companies about the reasons for prescribing. Such as? Such as the patient had difficulty swallowing when she did not. Such as the patient had tried other medications generic medications before sepsis when the patient had not. The patient had a history of cancer or a cancer diagnosis. Now, I'm sorry to keep harping on this, but it remains a concern for me. Now please connect for me the mailing in the bribe scheme with these types of misrepresentations. Yes, Your Honor. The bribes generate the prescriptions, but the patients who receive those prescriptions, they don't meet the insurer's criteria for insurer payments on the drugs. So the IRC lies about why the prescription was issued or the patient's medical conditions, prompting the insurance companies to make payments. So the bribe generates the prescriptions and then the defendants have, through the IRC, misreport why the prescription was actually issued or the patient's conditions that supposedly merited the prescription. So Mr. Lieberman, let me try it this way. If we leave aside for the moment the CSA and the Honest Services, your thesis for upholding the other two both of the other two predicates is that the record and the law permit us to review them as being interlocked so that they are all part of one and the same fraud manifested on the front end by the mail fraud, the bribery, and on the back end by the misrepresentations to the insurance companies, the insurance fraud, the wire fraud, but all part of one and the same, I think you used the phrase, feedback loop? Yes, Your Honor. Okay. I just want to be sure I understand your theory of the case. Yes, that is our theory as to why the fraud predicates survive. And before I turn to some of the evidentiary considerations, Ms. Lee, Mr. Simon, and Mr. Rowan have made specific sufficiency objections with respect to the fraud predicates. I'm running low on time. I'm more than happy to just rest on my brief and the district court's discussion of those defendants. I would like to hear your argument. Sure, Your Honor. So for Ms. Lee, this is at Government Addendum 36-38 where the district court charts the evidence. She's unquestionably aware of the bribes to the doctors. The question is, could a jury recently find her knowledge that there was insurance fraud at the back of the line when these prescriptions go to the IRC? Lee has copied on an email about the IRC director coaching a sales rep for proper diagnosis code. That's Government Appendix 62. At the start of the IRC scheme, Lee was personally working on Dr. Arbach's insurance authorizations and having contact with Ms. Guerreri, 43-37 of the Joint Appendix. And lastly, Ms. Lee supervises two sales reps, Holly Brown and Brent Zmanski, and they testified at trial and they testified as to their knowledge of these deceptive tactics that the IRC is using. Jury could reasonably infer that she has similar knowledge. Mr. Simon, he attended, after his promotion, he occasionally attended the 8.30 a.m. management meeting where the IRC was discussed daily. Mr. Babich testified that during this meeting the participants discussed the IRC's fraudulent tactics, such as lying about whether the patient has difficulty swallowing, the history of cancer, what prior medications, or listing certain medications that the patient may not have previously tried. Also, Mr. Simon toured the IRC and listened to calls and the jury heard those same calls. We have testimony from an in-house compliance officer who visited the IRC, listened to those calls, watched the call reps just rattle off information about patients without having any documents in front of them, and had the reaction of, this is, something's not right, this is fraud. So the jury could reasonably infer, based on his occasional presence at the morning meeting, in his tour of the IRC, that he had knowledge that the bribe scheme involved insurance fraud. Finally, Mr. Rowan. Mr. Rowan knew at the outset, this is at government addendum 39, charted by the district court, Mr. Rowan knew that doctors at the outset were generating a high number of prescriptions, but the insurers were denying payment. He later monitors the insurance approvals from his folks and he, too, was very successful in generating revenue, so he understands the company had fixed whatever problems it had. And then, most importantly, as the district court charted, he is present at an IRC training session. And I disagree with opposing counsel on this. The jury could reasonably find that the folks at that session understood that Ms. Gouray had told the audience that the IRC was engaged in certain fraudulent tactics. And we charted this out at our principal brief, page 75. Gouray tells the audience, look for that 20-year-old history of cancer. Even if it's unrelated to why that patient has sought medical treatment, she also tells the audience, her employees, her call center employees, look through patient records and find cancer, quote, a lot of the time. And then she says that this information, when reported to insurers, is a sure approval or a 99.9% approval. That presentation shows that Ms. Gouray and her staff are reporting things to the insurance company about the patient that were not the justification for the doctor's prescription. That is insurance fraud. And that's bolstered by, we think, Ms. Ligotti's testimony, 8292. She attended that same session. We asked her about what does history of cancer mean? And she testified that noting a history of cancer makes the insurance company approve the drug. As the district court said at Rowan Sentencing, I have never found the tapes of that session to be exculpatory. And the jury agreed. It was a reasonable inference. We're here at sufficiency. And his jury's finding, with respect to Mr. Rowan, should stand. I am short on time. I'll just make a couple brief points about the spillover claim and, as well, Mr. Simon's conflict of interest claim. The spillover claim requires the defendants to show that the testimony vis-a-vis the CSA and the government's arguments were so inflammatory that it caused a miscarriage of justice wound. It prevented the jury from having a fair and accurate deliberation on the fraud predicates. Again, Mr. Gurry has this claim no matter what. The court will have to address this claim if it rejects the government's cross-appeal on the other four defendants. The district court walked through all of this court's spillover factors and concluded otherwise. All these are evidentiary considerations and were also in a motion for new trial. The defendants have not shown, but this district judge abused her discretion in how she balanced those spillover factors. And the lead point I would like to note is government amendment 41, the district court says, I would have likely admitted the patient testimony in a trial limited to the fraud predicates. And the court repeats that at 12-102 of the joint appendix. This is key in our view because it's hard to see where you have spillover, where the jury was seeing the same evidentiary picture in a trial limited to the fraud counts. And they haven't shown an abuse of discretion in the district court's statement that I would have likely admitted this testimony in a more limited trial. Going back to some of the reasons that Judge Selya mentioned in our last exchange. In this, part of this fraud scheme was to push up the dose on the patients. Before the initial sales launch, the patient's support was upset because patients were dropping off and he attributed that to low-dose prescriptions. His command, push up the dose, move the patients up to higher doses. The patient testimony vis-a-vis those 13 conspirator doctors shows how those co-conspirators pushed up the dose on the patients, thereby generating the prescriptions to the IRC, thereby facilitating the fraud scheme. The doctors did that by ignoring patient complaints about the side effects, ignoring signs that the patient had developed addictions, excuse me, or signs of drug abuse. And it's not all doctors nationwide. The indictment here focused on 13 co-conspirator doctors that by the end of 2012 were generating 60% of the company's revenue through this scheme. So their conduct in executing the command, push the dose, would unquestionably be relevant in a trial limited to just the fraud scheme. Happy to rest on my grease on the remaining spillover factors and just to say that there was no abuse of discretion. On the closing argument point, the only objection that we have here today as to a defect in the District Court's period of instructions was that to the loaded gun metaphor, people intended reasonably foreseeable consequences of their actions. The District Court gave a period of instruction that was direct, clear, and just omitted one thing that the defense requested. The District Court declined to admonish the government in front of the jury for making the comment. And we suggest that that narrow question is the apex of the District Court's discretion. The judge had a front row seat to the closing arguments. She saw and heard the disputed comments, and she occupies the prime position to determine whether or not the period of instruction she gave was sufficient or whether she needs to further admonish the government in front of the jury for the comment. The defense has not shown abuse of discretion in the District Court's decision to just stick with what is otherwise a strong and direct period of instruction, which accurately states the CSA intent element and informs the jury that knowledge of reasonably foreseeable consequences is not enough to convict. Final point on the conflict of interest claim that Mr. Simon has raised. Again, the broad abuse of discretion review, the District Court walks through in a number of pages, 77 through 84 of the government addendum, explaining why the proffered strategy is not viable, noting that before other defendants' pretrial decided not to attack the privilege of the company, so much so that they actually filed a pretrial motion preventing the government from eliciting privileged company documents or communications that government appendix 25. That type of record where co-defendants are also making the decision, as this court noted in Bryan and Fahey, is relevant to the viability of termination. My final point, Simon's claim today, it appears to say this would have been relevant to my good faith defense. As the government pointed out in our brief, good faith is a question of what facts are in one's head at the time of the offense conduct. Based on those subjective facts, did I have a reasonable good faith belief that I was operating in compliance with the law? Simon has never reviewed the report, so whatever is in there has no bearing on whether he had a good faith belief, given the facts he had known at the time, that he was operating in compliance with the law. That may be so, Mr. Lieberman, but certainly what is in there may make the good faith belief that he claims to have more reasonable or appear more reasonable. Isn't that true? I disagree, Your Honor, and we cited a strange sight from this circuit and other circuits. When a defendant is seeking to admit information on a good faith defense, the document that he or she is seeking to admit, the defendant actually has to have reviewed the document and relied on the document to say that this was relevant to my thinking that I was operating in good faith. Now, to the broader point, maybe there would have been something exculpatory in there, separate from the good faith exception. I think the district court thoroughly explained why all the record and facts before it suggested that the opposite was true. No abuse of discretion. I just want to make sure to preserve the government has a backup claim that the district court did not resolve. If the court looks at the company's representation of incest, that engagement letter, the company explicitly authorizes attorney Tyrell to act adverse to the company's interest. So I just want to preserve our argument that there is no actual conflict in this case and that is an essential step for Mr. Simon to get relief on this claim. There have been a number of other claims discussed this morning. I'm a couple minutes over time. I'm more than happy to rest on my griefs unless members of the court have any questions or concerns with any of the district court's remaining rulings under review or the government's arguments supporting them. None from me. Questions from the court?  All right. Thank you, Mr. Stoyarchevich. Thank you, Your Honor. Mr. Stoyarchevich. Thank you, Your Honors. I would like to go to two topics again in response to a lot of the government's argument. One, the cross appeal, and I will hope for a little bit of indulgence from the court since the government went into some of the evidence. And two, I want to circle back to the mail fraud questions, Your Honor, that continue to arise. And on the cross appeal, before I get into the facts, I just want to speak to two framing issues, one raised by Judge Selya, one raised by Judge Helpe. Judge Helpe, Rule 29 simply says that the court on a defendant's motion must enter a judgment of acquittal for any offense for which the evidence is insufficient to sustain a conviction. But Rule 29 does not explain the process by which the court does that in terms of how it weighs inferences. The equipoise rule and the cases around it are an attempt to do so, and that's why the equipoise rule is not an additional requirement. It is a way to figure out how the district court must enter this judgment of acquittal when the evidence is insufficient to sustain a conviction. And, of course, we know a conviction, in order to be sustained, has to be proof beyond a reasonable doubt. And how has this circuit articulated that standard? I absolutely agree, Judge Selya, it is de novo. But that does not mean that it is any inference wins and reinstates the verdict standard. And I'll give you two cases that are cases of this court applying it. One is Burgos, which is the case Judge Burrow cited, when the evidence gives equal or nearly equal circumstantial support to a theory of guilt or innocence, a reasonable jury must have necessarily entertained a reasonable doubt, and therefore the verdict must be reversed. And I also want to go to Guzman-Ortiz. That is the most recent case, and I believe my colleague on the government side said this court has not been affirming these kind of acquittals. That's not true in Guzman-Ortiz. It is. District court granted the Rule 29. The Court of Appeals affirms, and here's what they say. A judge, in doing the Rule 29 analysis, may not stack inference upon inference in order to uphold the jury's verdict. The strength of an inference cannot be decided in the vacuum. The inquiry is inherently comparative. How likely is it that one conclusion, as compared to the others, follows from the underlying facts? So given that structure, now let's turn to the evidence. And one final framing point. The government keeps talking about the intent here being to prescribe outside the usual course of professional practice. If that was the standard, they might actually win on the cross-appeal, because I would concede that prescribing for so-and-so a bribe is outside the usual course of professional practice. I would certainly hope it to be. But that's not what it is. If you look at how the government charged the case, it's outside the usual course of professional practice and not for a legitimate medical purpose. And if you look at Joint Appendix 10-985, the government specifically concedes that point and says that for either of these acquitted predicates, they would have had to show specific intent for not a legitimate medical purpose. So now that we're there, what do we do with the evidence? The first thing I would say is, yes, it is de novo, but it's not de novo as to these little snippets that the government wants you to look at. It's de novo as to this 51-day trial and all of the way the evidence came in, including the absence of evidence in vast, vast majorities of that record on this issue. So I think that's part of the analysis. And also, I don't want the court to misunderstand what I'm doing here in arguing the evidence. I'm not trying to reprise a closing argument to the jury. I'm talking about the strength of the inferences. I also want to point out, here's one thing the government hasn't argued. They have not argued at any point that the patient harm testimony at issue here is evidence that supports the CSA or honest services fraud verdict. They've stayed away from that argument, and they said that was cursory and undramatic testimony. But the way they presented it, it was the heart of their case. And in every other setting, they said it was very compelling. I think that is interesting to note. And finally, look at how the government's closing is also relevant. This idea of a tacit understanding based on these snippets of evidence is something the government argued for the first time post-trial on Rule 29. How they presented the case to the jury was this is what these defendants did to these patients. And so I feel like it's a bit of a catch-22 having that presentation gone in, and now the government is pointing to something else to try to rescue the verdict. But since it is, let me address it in a little more detail. I want to address pill mill, direct ship, quotas, and dose. You're going to have to do that in one minute. Okay. I've addressed pill mill. All I will say is Babbage was asked, you certainly can't say that Kapoor ever saw this. Babbage agreed. Direct ship. Babbage testified. Ran it by lawyers. Nothing intentional or bad about it. No witness testified to the contrary. And the shipping work, the reason these practices had separate pharmacies was because the requirements are based on the substance fentanyl, not based on the drug sepsis. And so they had large practices. Quotas. The key thing the government takes out is the switch strategy. Sepsis was the fifth drug in the class to come in, and they were trying to get doctors to switch from identical drugs. And even then the quotas were one to two a week. Dose. I've addressed a lot of it, but I also need to say that there is never been an argument or any evidence that the dose that sales reps said, take this particular patient up. The evidence was that they said, this is at a low level. Here's what the effect of those messages. Sales reps give those kind of messages, and there was a reason for them. And, your honors, on the issue of, my apologies, your honors, I just want to see if I have one other thing on the evidence, which is there is no evidence that doctors upped doses on particular patients in response to this message. Again, look at Auerbach. He was given the effect of those messages. He kept writing at 100 to 200. On the mail fraud. Thank you, counsel. We will take the rest of your arguments on the briefs. Thank you. Ms. Siddall. Thank you, your honor. I would like to briefly respond to the government's argument on the gun analogy. The gun demonstration in closing was so vivid and so memorable, especially in comparison to the insurance case against Mr. Gurry, which the government joked at trial was putting everybody to sleep. But the curative instruction included a correct statement of the law, but it did not include an explicit instruction that the government's argument was improper and that it should not have been made. And that sort of instruction has been endorsed by this court. Excuse me, counsel. It's never been required by this court. That's correct. The jury was told that the argument was improper and they should, the comment was improper and they should disregard it. We've never required a district judge to tell a jury that the government or any other party shouldn't have made the argument or to reprimand or castigate a party. We left decisions like that to the discretion of the trial judge who knows how the parties have behaved during the trial and what the situation is with the jury and with the case. And why should we make an exception and create a new vista in this case? We're not asking that the court require such an instruction. You got the entire curative instruction you wanted with that exception. Yes. We largely got the curative instruction that we asked for. Not largely, totally, with that one exception. Yes. And we believe that that exception would have been warranted in this case even if it's not required. And in my last moment, I'd like to emphasize the weakness of the case against Mr. Gurry, which is the critical factor in determining whether any errors were prejudicial. This case against Mr. Gurry was turned on an uncorroborated cooperator. And Ms. Gurry, because she was uncorroborated, needed to explain why there was no corroboration of her testimony. She did so by claiming that Mr. Gurry had an office in the IRC and that he would have been hearing IRC calls on a daily basis. But the weight of the evidence is that Ms. Gurry was not telling the truth on that point, including testimony from Kimberly Fordham, who was a prior authorization specialist who was in the IRC on a daily basis, who said she maybe remembered seeing him three to four times at that, and testimony from Maury Rice, the IT specialist, who set up the IRC and who specifically testified that Mr. Gurry did not relocate to the IRC building. And thank you, Your Honor. We would simply request that the court vacate Mr. Gurry's conviction and remand for a new trial. And thank you. Mr. Kendall. Yes, Your Honor. I'd like to do two things. I want to address the court's questions about Foley, and then Mr. Lieberman misstated the factual record on Roe insufficiency issues and asked you to indulge me just enough time to correct those errors, and I'll do that quickly. With respect to Foley, I think Foley is not a problem at all for my case. There you wrote in your opinion that it really wasn't an appropriate general challenge. He had limited it to really the venue issue, and that's the way the perspective of it was looked at. We did not limit our challenge at all. We explicitly said we were not limiting it, and Judge Burroughs found that when she twice wrote in the opinion that I In addition, we cite in our brief an old case, but I think a very good case, United States v. Monag, M-O-Y-N-A-G-H, a 1977 decision. In that case, the defendant did not move for acquittal in all counts, but in doing the sufficiency analysis, the judge looked at all of the evidence that would undergird all of the counts. And this court said they would still apply de novo review because in the substantive result, the district court had looked at the issue, even if it wasn't perhaps articulated conclusively. And so the appeals court had the benefit of the district court's analysis. In our situation, the government in its brief had argued one theory of mail fraud. When Judge Burroughs ruled, she took the wire fraud theory and used that to uphold the mail fraud. She clearly discussed our challenge to the wire fraud. We had moved on that. There's no dispute. So for a substantive basis, this court has the benefit of Judge Burroughs' analysis on all of the evidence that would undergird both the mail and the wire fraud. So I suggest we don't have to fall back to Monag, but if we did, that would help us. But I think, as I said, we don't have to go there. If the court doesn't have any further questions than that, I'd just like to correct the errors in the factual record that Mr. Lieberman made. I could do it whichever way you want your honor, but I can do it in less than a minute. All right, proceed. Okay. He said that, first of all, he focuses everything on the tape and we agree. There's no witness to give any inculpatory about Rowan's state of mind. It's the tape. That's why we asked the court to read the transcript and Ligotti's testimony. He said that Ligotti testified that the history of cancer would get it approved. If you look at Joint Appendix 8292, it says it would make the insurance companies more likely to approve the PA. He said it was a definitive result. Second, she said that Judge Burroughs said that the tape was not as exculpatory as I had argued. Take a look at Joint Appendix 11652. It's from the sentencing. We're discussing the tapes about kickbacks and bribery that are separate tapes and have nothing to do with the IRC. Judge Burroughs' comments had nothing to do with the tape that's at the heart. It's the only basis for my client's conviction. I thank the court for its indulgence. Thank you. Thank you, Your Honor. So first of all, the conflict remember is reviewed de novo and not for abuse of discretion. The cases described the appropriate inquiry using words like plausible and viable defined as possessing substance. This means something very different from helpful or exculpatory, which is the Strickland question. The conflict question is whether there was a different strategy that unconflicted counsel could have pursued. Now, even though it's not a required showing, it is plausible and reasonable to infer here that the scabbing material would have been helpful, at least in part, as the district court herself noted repeatedly throughout the trial. At a minimum, as Judge Selye pointed out, it could have provided substance to an otherwise empty good faith defense. Now there are many species of good faith. The government cited an advice of counsel cases, which hold that a defendant needs to actually see the advice, but that is not the nature of Mr. Simon's argument. Whatever the other lawyers choices here, his trial counsel's judgment was tainted, but he was not last to be choices of others. He could have moved to sever just like the defendant did in Stryker biotech. The government also throws in at the end an argument that there was no conflict because of wild advanced waiver. This is handled at multiple levels in the, in the reply brief. The bottom line here is that this only applies to not to non substantially related matters, but the bankruptcy and the criminal case were intertwined. The rules of professional conduct say that such waivers are ordinarily ineffective. And look, the bottom line is it's totally implausible to believe that Steve Tyrell would have risked a multimillion dollar firm bankruptcy engagement to, to launch a full frontal attack on instances, attorney client privilege. Finally, on sufficiency, I would point out the most the government said in its argument was that there was an inference on which you could, there's a basis to inform Mr. Simon had knowledge of the IRC fraud, but knowledge and acquiescence are not legally sufficient under both the cases and the jury instructions. And in my reply brief, I took apart very meticulously. Each of the base purported bases of knowledge that the government sets work here. So unless the court has further questions, I would further rest on the bridge. Thank you. And the court expresses its appreciation to all counsel. That concludes arguments in this case, attorney Weinberg, so you're still your coverage. So though, uh, Kendall Horstman, Beck and Lieberman, you should disconnect from the hearing at this time.